## Case No. 5,610.

### GORDON v. HOLIDAY.

[1 Wash. C. C. 285.] [1]

Circuit Court, D. Pennsylvania. April Term, 1805.

#### MISNOMER—CONFISCATION.

1. Where two names have the same original derivation, or, where one is an abbreviation or corruption of the other, but both are taken promiscuously, and according to common use, to be the same, though differing in sound; the use of one for the other, is not a material misnomer.

[Cited in Gordon v. Kerr, Case No. 5,611; McClaskey v. Barr, 45 Fed. 153.]

[Cited in Wilkerson v. State, 13 Mo. 91.]

2. If the name be wholly mistaken, and repugnant to truth, the misnomer is fatal.

[Cited in McClaskey v. Barr, 45 Fed. 153.]

3. Query, if "Henry," for "Harry," is a misnomer.

4. Operation of the treaty of 1783, upon the exercise of legislative powers for the confiscation of the property of those who had been engaged in hostilities against the United States; or who neglected to surrender themselves, when called upon by law so to do.

Harry Gordon, being seized of the land in question in fee simple, on the 6th of March 1778, as well as on the 20th of March 1781; an act of the legislature of Pennsylvania was made, on the former day, attainting certain persons therein specially named, of high treason; and forfeiting their estates, unless they surrendered themselves by a certain day, and took their trial for high treason; and declaring that all persons, subjects or inhabitants of that state, or those who have real estates therein, who adhere to, and willingly assist the enemies thereof, or of the United States, and whom the supreme executive council of the state, by their proclamations, should name and require to render themselves by a certain day therein to be mentioned, to some one of the justices of the state, and abide their legal trial for such their treasons; and who should not render themselves accordingly, and abide their said trial; should, from and after the day fixed by such proclamation, stand, and be attainted of high treason; and should suffer such pains and penalties, and undergo all such forfeitures, as persons attainted of high treason ought to do. The law then proceeds to authorize the president of the executive council, to appoint agents to sell such forfeited estates, and to make conveyances to the purchasers. On the 20th of March 1781, a proclamation was issued, reciting the names of sundry persons, and among them Henry Gordon, now or late an inhabitant of the state of Pennsylvania, and required him by the name of Henry Gordon, now or late a military officer in the British army, now or late of Kennet township, in the county of Chester, who had been guilty

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

of aiding the enemy, and adhering to them; to render themselves to some magistrate, on or before the first of November following, to take and abide their trials for their treasons; which, if they fail to do, they shall be, and stand attainted of high treason, and stand the consequences thereof. Harry Gordon did not render himself, in compliance with this proclamation; in consequence of which, the lands in question, and other tracts, were, on the 18th of April 1782, sold by auction to John Woods, the highest bidder; who paid for the same on the first day of May, in the same year; and on the second of October 1783, a deed was made by the governor of Pennsylvania to Woods, under whom the defendant claims. On the 31st of January 1783, the legislature passed a law, entitled "An act for the attainder of Harry Gordon, unless he surrender himself, and for other purposes." [2 Laws Pa. p. 87.] It recites that Harry Gordon was seized of certain lands in this state, and it was alleged that he did adhere to the enemies of this state, and the governor did require Henry Gordon to render himself by a certain day to take and abide his trial, thereby intending to require the said Harry Gordon to surrender himself, &c. and that the said Harry Gordon did not surrender himself, pursuant to said proclamation; and the said executive council did dispose of his real estate, in this state, as if he had been legally attainted; &c. and that application had been made to the general assembly, to cure the said misnomer, and to confirm the rights of the purchasers of the said estates of the said Harry Gordon. It then proceeds to enact, that if the said Harry Gordon do not surrender himself, on or before the 24th of July following, and abide his legal trial for high treason, he shall, from and after that day, stand and be attainted of high treason; and shall suffer, and forfeit his estate to be disposed of, in the same manner, as if he had been legally and rightly called upon by the aforesaid proclamation: and then it proceeds, in the event of his not appearing, to confirm the rights of the purchasers. The law then, in another clause, declares; that the heir, devisee, or alienee, of persons whose estates had been forfeited, under and by virtue of proclamations, should not be permitted to recover against the commonwealth or purchaser, in consequence of any misnomers, where the court and jury, before whom the cause should be tried, should be satisfied that the person so attainted, was the person really intended to be called upon, by the proclamation. Harry Gordon did not surrender himself in consequence of this law. He died about the year 1787, and the lessor of the plaintiff, is the heir at law, of the oldest son of the said Harry Gordon, who died intestate, and without issue. Many depositions were taken in Scotland, which proved, that Harry Gordon, the father of the lessor of the plaintiff, was baptized by the name of Harry, and that he was always called by the name of Harry, and not Henry; that he came to America long before the Revolution, and left it in 1775; and held a military commission in the armies of the king of Great Britain. Whilst in America, he lived in the township and county mentioned in the proclamation.

The plaintiff's counsel contended, first: that Harry Gordon never was legally attainted, by the act of 1773, and the proclamation of 1781; that Harry, and Henry, are different names. They cited 1 Com. Dig. 19; Cro. Eliz. 57, 202; 2 Strange, 1214, where Harry, was called Henry; and the court directed an amendment, which would have been unnecessary, if they were the same. 2 Hale, P. C. 175–177; 2 Hawk. 185, c. 25, s. 69; 1 P. Wms. 613. Where, in an act of attainder, where Major-General Alexander Gordon, laird of Oquintool, was attainted by the name of Thomas, and deemed fatal. Fost. Cr. Law 79, the Case of Lord Pitzlego [Respublica v. Buffington], 1 Dall. [1 U. S.] 60, where Joseph Buffington was called in the proclamation, as of East Bradford township, whereas he was of West Bradford township, and deemed fatal. That he is recited to be of the state of Pennsylvania; whereas he left Pennsylvania before the Declaration of Independence, and therefore he was not truly described; as Pennsylvania at that time was not a state. 2d. That if he was not legally attainted by the first act and proclamation, he could not be so by the act of the 31st January 1783; because, the sixth article of the treaty of peace prevented all future confiscations. The provisional articles were signed the 30th of November 1782. They were to take effect so soon as peace should be agreed on between Great Britain and France. The preliminary articles were signed, on the 20th of January 1783; from which time, it was contended, the treaty took effect. That measures were taken in this country, for carrying the treaty into execution, in March and April 1783, by congress, so soon as they heard of the signing of the preliminary articles. They cited the Annual Register, 14; Cong. Journal, March 24, 1783, pp. 164, 178, 181, 265, 266; Mart. Law Nat. 332; [Bain v. The Speedwell] 2 Dall. [2 U. S.] 40; Grot. c. 4, § 12; [Respublica v. Gordan] 1 Dall. [1 U. S.] 233; Vatt. Law Nat. bk. 4, c. 3, 1. 24. The president's message in 1793, and the correspondence therein stated, between Mr. Jefferson and Mr. Hammond. They relied, that the act of 31st of January 1783, did away the former forfeiture, and attainder, and that this act was arrested in its operation by the treaty.

The defendant's counsel insisted that "Harry" and "Henry" were the same; that the rule is, that if the names are in original derivation the same, or are the same in common use, there is no variance. As Peter and Piers, Joan and Jane, Saunders and Alexander, Franciscus and Francis, Garret, Gerard and Gerald, Gilb. Hist. Com. Pl. 219; 1 Leon, 146; Cro. Jac. 425, 534; Fost. 84;

Willes, 488. But where the misnomer is repugnant to truth; there it is fatal. 2 Wooddeson's Lectures, 627.

On the 2d point, that the treaty had no binding effect, until the definitive articles of peace were ratified, or at least made public; they were signed on the 3d of September 1783, and proclaimed in America on the 18th of October; and transmitted by congress to the several states, in the same month. They relied on the president's message, in 1793, to show that the act of the 31st of January 1783, was not an infraction of the treaty.

Third. However the case may be with Harry Gordon, if he were the plaintiff; still the plaintiff claiming as heir at law, cannot maintain this suit, if the jury should be satisfied that he was the person intended by the law; for as to his heirs and alienees, no future time of trial is fixed by the law; but their rights were barred, long before we had even notice of the signing of the preliminary articles of peace.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

PETERS, District Judge, delivered an opinion in favour of the plaintiff, on all the points.

WASHINGTON, Circuit Justice. The first question is, was Harry Gordon, the father of the lessor of the plaintiff, legally attainted of high treason, by virtue of the act of the 6th of March, 1778, and of the proclamation and consequent proceedings thereon? He was called on, by the supreme executive council, to appear and take his trial, by the name of Henry Gordon, now or late of Kennet township, in Chester county; and now or late a military officer in the British army. It appears that he was baptized, and always called and known, by the name of Harry. The other part of his description is true; and the single question on this point is, whether there is a misnomer, which will vitiate the attainder? The use of names is, to describe the individual of whom we speak, so as to distinguish him from some other person; the rule, therefore, as laid down in Gilbert's History, C. P. and other books, is a rational and sound one; that where two names have the same original derivation, or where one is an abbreviation or corruption of the other, but both are taken promiscuously, and according to common use, to be the same, though differing in sound; the use of one for the other is not a material misnomer. If, in common use, the names be the same, the person cannot be misnamed, if either be used. Griffith's Case is a strong one to illustrate the rule. Saunders and Alexander, which differ entirely in sounds, are stated not to be distinct names of baptism; because, usually Alexander is called Saunders; so Piers and Peter, Joan and Jane, Franciscus and Francis, Garret, Gerald and Gerard. But if the name be wholly mistaken; if it be repugnant to truth, as if Alexander be used

instead of Thomas, the misnomer is fatal. The question therefore always is; are the names different, not in sound, but in derivation, or in common use. No cases directly in point, have been cited. By the case from Willes's Reports, it seems that two of the judges thought they might be used as being the same. But the judges certainly thought them different, in the case of The King v. Roberts, 2 Strange, 1214, or the amendment would have been unnecessary. That the legislature of this state thought the names different, is very clear.

The act of the 31st of January, 1783, after reciting the proclamation, and the proceedings under it, and that fears were entertained by the purchasers of the validity of the sales, on account of the misnomer, and praying to have them confirmed; proceeds to legislate upon the subject. Instead, however, of confirming the sales, which would have been proper, if the names had really been the same in the mind of the legislature, they do the very reverse. They pass the law, the title of which is "An act for the attainder of Harry Gordon," &c. They order him to appear, and take his trial, by a certain day; which, if he fails to do, he is from thence to stand attainted, and to forfeit his estate, to be disposed of in the same manner, as if he had been legally and rightly named in the proclamation. Here, then, we have a legislative declaration, that Gordon had not been legally and rightly named in the proclamation; and so entirely fatal did the legislature suppose the misnomer to be, that they afford him a new opportunity of saving his life and fortune, from the consequences of an attainder. If he had appeared, and shown himself never to have owed allegiance to the state of Pennsylvania, he certainly would have escaped those consequences. The former attainder is done away by this law, unless two attainders against the same person, can exist, and be in force, at the same time: for, by this law he is to stand attainted, and to forfeit his estate, from and after the 24th of July, if he then fail to appear. This, too, was the meaning of the legislature. For if it was intended to cure the misnomer, on the ground of its immateriality, what had the legislature to do, but to confirm the former attainder and sales. And, if in the Case of the King and Roberts, the court could cure the error, by an amendment; could not this legislature, in their omnipotence, do it, if they supposed the misnomer immaterial? By setting all aside, and directing proceedings de novo, they, in language most emphatic, pronounce their opinion, that the name by which he had been called upon, was repugnant to truth, and that common justice and humanity required the thing to be done over again. This, then, brings us to the consideration of this law; and to the operation of the treaty upon it. The sixth article declares, that there shall be no future confiscations, &c. The preliminary articles of peace were signed on the 20th of January; eleven days before the passing of

this law; and were recognised, and in fact ratified, by the government of the United States, some months before the day appointed for Harry Gordon to appear, and take his trial. Upon this state of the case, it is quite unnecessary to decide, whether the treaty took effect on the 20th of January, when it was signed, because it is not to be questioned, but that it did so, at the moment it was known in this country; and was ratified either formally, or impliedly. The effect of this treaty was, to do away so much of this law, as was calculated to produce a confiscation of Gordon's estate, on account of the part he had taken in the war; to subject him to the meditated prosecution, or to expose him to future loss or damages in his person or property. If he had appeared on the 24th of July, agreeable to the notice, he could not have been tried; neither could judgment pass against him, by default; the treaty, intervening between the law, and the completion of the confiscation, repealed the former, and prevented the latter; for it was not the law attainted his person, and confiscated his estate; but his conviction, if he had appeared and abided his trial, or his failing to appear. This settles also the last point; for the treaty not only prevented the confiscation of Harry Gordon's estate, during his life, but protected his interest and estate, in the land that was a fee simple, with all the privileges attending such an estate; so that, on his death, it might be willed or devised; or he might have alienated it. To say that his interest was protected during his life, but that it was to stand confiscated as against those claiming under him, would be a fraudulent construction of the treaty, which protected the whole. But I do not think that this clause extended to the case of persons claiming under Gordon, but to those who claimed, in consequence of misnomers in the proclamations. But Gordon was to be specially tried anew, by his right name, under the law. I am therefore of opinion, that the verdict should be in favour of the plaintiff. Verdict for plaintiff.